UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-05099-JAK (MARx) | Date | July 14, 2026 |
| Title | D.B., et al. v. Bellesa Enterprises US, Inc. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| M. Lindaya | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE MOTION TO DISMISS FIRST AMENDED COMPLAINT (DKT. 30)**

## I. Introduction

On June 5, 2025, D.B. and B.S. ("Plaintiffs"), proceeding pseudonymously,[1] brought this putative class action against Bellesa Enterprises US, Inc. ("Enterprises"). Dkt. 1. On August 4, 2025, Enterprises filed a Motion to Dismiss the Complaint. Dkt. 20. On August 25, 2025, Plaintiffs filed a First Amended Complaint ("FAC"), which is the operative one. Dkt. 25 ("FAC"). The FAC added Bellesa Productions Inc. ("Defendant") as a co-defendant of Enterprises. Dkt. 25 ¶¶ 26–27.

The FAC advances the following nine causes of action against Defendant,[2] by Plaintiffs and on behalf of a putative nationwide class and/or certain subclasses: (1) common law invasion of privacy; (2) negligence; (3) breach of implied contract; (4) unjust enrichment; (5) violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq.*; (6) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*; (7) violation of the New York General Business Law ("GBL"), N.Y. Gen. Bus. Law § 349; (8) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 360, *et seq.*; and (9) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* Dkt. 25 ¶¶ 110–205.

On September 8, 2025, Defendant[3] filed a Motion to Dismiss the FAC. Dkt. 30 ("Motion"). The Motion seeks to dismiss the FAC for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and to dismiss Enterprises as a party for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). *See generally id.* In support of the Motion, Defendant submitted a Request for Judicial Notice. Dkt. 30-7 ("Request for Judicial Notice"). On October 14, 2025, Plaintiffs filed an opposition to the Motion. Dkt. 35. On November 4, 2025, Defendant filed a reply in support of the Motion. Dkt. 39. A hearing on the Motion was held on December 8, 2025, and it was taken under submission. Dkt. 45.

---

[1] Plaintiffs were permitted to proceed pseudonymously by a September 2, 2025 Order issued by Judge Rocconi. Dkt. 29.
[2] All claims against Enterprises have been dismissed. Dkt. 51.
[3] The Motion was originally filed by Productions and Enterprises. Because all claims against Enterprises have been dismissed, Defendant is properly considered the moving party.

On February 13, 2026, the parties filed a status report. Dkt. 50. There, Plaintiffs state that they intended to voluntarily dismiss, without prejudice, their claims against Enterprises. Dkt. 50 at 2. The parties also filed a proposed order dismissing such claims. Dkt. 50-1. Accordingly, on February 13, 2026, an Order issued dismissing without prejudice Plaintiffs' claims against Enterprises. Dkt. 51. For that reason, the portion of the Motion that contests personal jurisdiction over Enterprises is **MOOT**.

For the reasons stated in this Order, as to the remaining issues, the Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## II. Background

### A. Parties

D.B. is a citizen of Washington, who resides in Spokane County.[4] Dkt. 25 ¶ 16. B.S. is a citizen of New York, who resides in Herkimer County. *Id.* ¶ 21. Defendant is a for-profit corporation incorporated in Canada, whose principal place of business is in the province of Quebec. *Id.* ¶ 27.

### B. Allegations in the FAC

Defendant produces and distributes pornographic video content marketed to women through www.bellesa.co and www.bellesaplus.co (collectively, "Website"). Dkt. 25 ¶ 4. Plaintiffs are alleged to have used the Website in order to view pornography privately. *Id.* ¶ 5.

Defendant installed software created by Google ("Google Pixel") on the Website to identify website users and make use of Google's Business Tools. *Id.* ¶ 51. The Google Pixel is "one of the tools used by website operators to track user behavior." *Id.* ¶ 52. In exchange for installing the Google Pixel, Defendant and other website operators received information from Google about users of the Website. *Id.* ¶ 41. Specifically, Defendant received advanced advertising services and cost-effective marketing in exchange for allowing Google to install the Google Pixel on the Website. *Id.* ¶ 77. Google also sells to advertisers the information collected from the Website. *Id.* ¶ 43. Google aggregates this information into "advertising profiles," which consist of the universe of information Google has collected about a given user, and sells those profiles to advertisers. *Id.* ¶ 45. Using such profiles, advertisers can target users based on "hyper-precise" personal characteristics, including their location, age, race, interests and political affiliations. *Id.*

In the default state provided by Google, the Google Pixel installed on a third-party website captures and discloses to Google only "automatic events" that involve "routine user behavior." *Id.* ¶ 68. However, Defendant intentionally configured the Google Pixel on the Website to "collect and transmit large amounts of additional user data." *Id.* In particular, Defendant disclosed to Google the title of and URL for each video that its users are viewing. *Id.* ¶ 69. At the same time, Defendant disclosed to Google certain cookies, which identify the user's Google account, along with other information that is

[4] All background and other factual matters discussed in this Order are based on the allegations advanced in the FAC.

"commonly used to create a browser fingerprint,"[5] such as the user's language preference, screen resolution, browser software and version, and operating system software and version. *Id.* ¶ 70.

Each of the Plaintiffs registered an account on the Website and also accessed the Website on personal electronic devices several times during 2024 and 2025. *Id.* ¶¶ 17, 22. Plaintiffs were not aware of the data that was being collected by the Google Pixel, were not able to detect the Google Pixel on the Website and were not provided with any disclaimer or warning about the use of the Google Pixel on the Website with respect to users. *Id.* ¶¶ 72–74. As a result, Plaintiffs did not consent to Defendant's conduct in collecting and/or sharing data about them. *Id.* ¶ 75.

Further, Plaintiffs had a reasonable expectation that the information each of them shared with Defendant would remain private and would not be shared with third parties for Defendant's commercial purposes. *Id.* ¶ 83. These expectations of privacy were heightened because people are particularly sensitive about disclosure of information related to watching or accessing pornography. *Id.* ¶ 86.

C. Class Allegations

Plaintiffs seek to represent the following Classes: (1) the Nationwide Class, which is defined as: "All natural persons who watched a video on the Website, and whose Sensitive Information[6] was disclosed or transmitted to Google or any other unauthorized third party," *id.* ¶ 97; (2) the New York Subclass, which is defined as: "All natural persons residing in New York who watched a video on the Website, and whose Sensitive Information was disclosed or transmitted to Google or any other unauthorized third party," *id.* ¶ 98; and (3) the Washington Subclass, which is defined as: "All natural persons residing in Washington State who watched a video on the Website, and whose Sensitive Information was disclosed or transmitted to Google or any other unauthorized third party," *id.*

## III. <u>Request for Judicial Notice</u>

A court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The party "requesting judicial notice bears the burden of persuading the court that the particular fact is not reasonably subject to dispute and is capable of immediate and accurate determination by resort to a source whose accuracy cannot reasonably be questioned." *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011) (citation modified). A court may disregard allegations in a complaint that are contradicted by matters properly subject to judicial notice. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

Similarly, documents that are incorporated by reference into a pleading may be considered on a motion to dismiss. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("On a motion to dismiss, [courts] may consider materials incorporated into the complaint or matters of public record. We

[5] A "browser fingerprint" is the device and browser characteristics associated with a given user. Dkt. 25 ¶ 66. These are often unique. *Id.* By tracking a "browser fingerprint," Google can compile a user's activity across the internet. *Id.*

[6] The FAC defines "Sensitive Information" as that concerning particular pornographic videos viewed by a person using the Website. Dkt. 25 ¶ 6.

have extended the doctrine of incorporation by reference to consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." (citations omitted)). "[T]he mere mention of the existence of a document" in a complaint, however, is not sufficient to "incorporate the contents of a document" such that the document may be considered in assessing a motion to dismiss. *Id.*

Defendant seeks judicial notice of the following: (1) the Terms of Service of www.bellesa.co; (2) the Privacy Policy of www.bellesa.co; (3) the sign-up window on www.bellesa.co; and (4) the availability of content on www.bellesa.co to any internet user, *i.e.*, not just users who have registered with the Website. *See* Dkt. 30-1 at 20; Dkt. 30-7. Plaintiffs do not dispute the accuracy or authenticity of these documents and facts, but contend that judicial notice cannot be taken of the contents of www.bellesa.co or resolve the parties' dispute over "what videos registered and unregistered users could access." Dkt. 35 at 22–23.

"In general, websites and their contents may be judicially noticed." *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) (collecting cases). That includes publicly available terms of service and other policies. *See In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1025 (N.D. Cal. 2014) (taking judicial notice of Yahoo's Terms of Service and Privacy Policy "because they are aspects of a publicly accessible website"); *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1053–54 (N.D. Cal. 2025) (taking judicial notice of screenshots "showing the account creation and purchase process" to determine what disclosures were provided). In assessing whether to take judicial notice of some or all of the foregoing matters, it is not material that Defendant did not provide a "specific webpage" to demonstrate that the content of www.bellesa.co is accessible by unregistered users. Dkt. 35 at 23. A visit to the www.bellesa.co homepage on July 13, 2026 makes clear that at least some video content is immediately accessible to unregistered users.[7] *See* Bellesa, https://www.bellesa.co (last accessed July 13, 2026). Moreover, Plaintiffs effectively concede that at least some video content is immediately accessible on www.bellesa.co without registration. *See* Dkt. 35 at 22–23 ("[I]t is not uncommon for websites to make *some* content available to unregistered users while other content is exclusive to registered users and Defendants do not establish that *every* video on Bellesa.co is available to unregistered users."). Further, the information as to which judicial notice is taken does not concern the contents of any video or other media available on the www.bellesa.co website, but only the fact that some videos can be accessed without registration by an internet user. Therefore, allegations in the FAC that are contradicted by these facts, of which judicial notice is taken, are not deemed true in resolving the Motion. *See Daniels-Hall*, 629 F.3d at 998.

Plaintiffs' citation to *Matthews v. Apple, Inc.*, 769 F. Supp. 3d 999, 1008 (N.D. Cal. 2024) does not warrant a different outcome. Dkt. 35 at 23. In *Matthews*, there was a dispute as to the authenticity of the documents for which judicial notice was sought. *Matthews*, 769 F. Supp. 3d at 1007–08. Moreover,

---

[7] Each of the Plaintiffs allegedly viewed video content on the Website in 2024 and 2025, but the allegations do not include the particular dates on which each did so. A review of prior versions of the homepage of www.bellesa.co, archived by the Internet Archive's Wayback Machine throughout 2024 and 2025, shows that, throughout 2024 and 2025, the functionality and accessibility of www.bellesa.co is the same as the present version, *i.e.*, throughout 2024 and 2025, at least some videos were accessible to unregistered users visiting that website. *See UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 604 n.2 (C.D. Cal. 2017) (collecting cases taking judicial notice of websites archived by the Wayback Machine).

*Matthews* cited *Rollins v. Dignity Health*, 338 F. Supp. 3d 1025 (N.D. Cal. 2018), which held that judicial notice is not appropriate *per se* when a document is publicly available. *Rollins*, 338 F. Supp. 3d at 1033 ("The only justification offered for this document is that it resides on a publicly-available website. Because this is an insufficient basis for judicial notice, the request is denied." (citation omitted)). In contrast, because the authenticity of the documents and the accuracy of the facts for which judicial notice is sought in connection with the Motion are readily determinable, it is appropriate to do so here.

Moreover, the Terms of Service and the Privacy Policy are incorporated by reference into the pleadings, notwithstanding that the FAC does not expressly refer to them. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (recognizing that incorporation-by-reference may be appropriate even "if the complaint does not mention the document at all"). The central allegation in the FAC is that Defendant failed properly to disclose that Plaintiffs' data would be gathered and made available to a third party. *See, e.g.*, Dkt. 25 ¶ 73. The actual disclosures made by Defendant to Plaintiffs therefore "form[] the basis" for Plaintiffs' allegations, and are accordingly incorporated by reference. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Courts addressing similar allegations in data privacy cases have reached the same outcome. *See, e.g.*, *Libman v. Apple, Inc.*, No. 22-CV-07069, 2024 WL 4314791, at *4 (N.D. Cal. Sep. 26, 2024) (privacy disclosures and welcome screen are incorporated by reference where plaintiffs alleged that the defendant improperly collected user data).

For the foregoing reasons, the Request for Judicial Notice is **GRANTED**. In resolving the Motion, certain material outside of the pleadings is considered, including: (1) the Terms of Service of www.bellesa.co; (2) the Privacy Policy of www.bellesa.co; (3) the sign-up window on www.bellesa.co; and (4) that some video content on www.bellesa.co is available to any internet user, *i.e.*, video content is not exclusively available to users who have registered with the Website.

## IV. Analysis

### A. Legal Standards

A "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The pleading must allege facts that, if established, would be sufficient to show that a claim for relief is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A complaint need not include detailed factual allegations but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555.

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified) (quoting *Twombly*, 550 U.S. at 556–57).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for failure to state a claim. It is appropriate to grant such a motion only where the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Under this standard, a complaint "must be dismissed when a plaintiff's allegations fail to set forth a set of facts that, if true, would entitle the complainant to relief." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020). In assessing whether a plaintiff has sufficiently stated a claim, courts accept as true all well-pleaded factual allegations and construe all factual inferences in the light most favorable to the plaintiff. *Id.* However, courts "are not required to accept as true legal conclusions couched as factual allegations." *Id.* "Taken together, *Iqbal* and *Twombly* require well-pleaded facts, not legal conclusions, that 'plausibly give rise to an entitlement to relief.' The plausibility of a pleading thus derives from its well-pleaded factual allegations." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (citations omitted) (quoting *Iqbal*, 556 U.S. at 679).

"In evaluating whether a complaint states a plausible claim for relief, [courts] rely on 'judicial experience and common sense' to determine whether the factual allegations, which are assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 641 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679). Therefore, courts "need not accept as true factual allegations that are not plausible on their face." *Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 922 (9th Cir. 2013). Further, "[c]onclusory allegations and unreasonable inferences . . . are insufficient to defeat a motion to dismiss." *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)), allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

B. Application

1. <u>VPPA Claim (Count V)</u>

a) Whether Plaintiffs Are "Consumers"

As a threshold matter, Defendant argues that Plaintiffs are not "consumers" under the VPPA because they have not adequately alleged that they rented, purchased, or subscribed to the audiovisual goods or services at issue. Dkt. 30-1 at 19–20. Specifically, Defendant contends that, because certain content on the Website is available to all internet users -- not just those who have registered with the Website -- Plaintiffs have not adequately alleged a nexus between the video content they viewed and their registration with the Website. Rather, Defendant argues that, to be a "subscriber of goods or services" within the meaning of the VPPA, Plaintiffs must allege that they accessed certain content *as a result* of

having registered with the Website.[8] *Id.* at 20. Plaintiffs respond that their registration with the Website is sufficient to make them "subscribers of goods or services" (and thus, consumers) irrespective of whether Plaintiffs' registration was factually related to their access to videos that were made available on the Website. Dkt. 35 at 20–22.

(1) Legal Standard

The VPPA defines "consumer," as "any renter, purchaser, or *subscriber* of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). Plaintiffs do not allege that they rented or purchased any goods from Defendant; their VPPA claim turns on whether Plaintiffs are "subscribers of goods or services." The VPPA, however, does not define "subscriber of goods or services" and the parties agree that there is no controlling Ninth Circuit authority on its definition or scope. Dkt. 30-1 at 19; Dkt. 35 at 20.

The Eleventh Circuit has held that "subscri[ption]" under the VPPA must involve "some type of commitment, relationship, or association . . . between a person and an entity," even if payment is not a required factor. *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015). The First Circuit reached the same outcome. *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 488–89 (1st Cir. 2016) (acknowledging that a "subscription" requires some relationship with the defendant "materially different from what would have been the case" had the plaintiff not registered with the defendant).

District courts have generally found that "subscri[ption to] goods or services" under the VPPA requires "a factual nexus or relationship between the subscription provided by the defendant and the defendant's allegedly actionable video content." *Tawam v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056, 1061–62 (S.D. Cal. 2023) (collecting cases). Under these standards, a plaintiff must allege that she "subscribe[d]" to video content -- the audiovisual "goods or services" on which her VPPA claim is predicated -- not merely that she subscribed to *unrelated* content. *See Carter v. Scripps Networks*, *LLC*, 670 F. Supp. 3d 90, 99 (S.D.N.Y. 2023) ("The Complaint plausibly alleges that the three plaintiffs subscribed to hgtv.com newsletters. But the Complaint does not include facts that plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience. *They were subscribers to newsletters, not subscribers to audio visual materials.*" (emphasis added)); *Jefferson v. Healthline Media, Inc.*, 674 F. Supp. 3d 760, 764 (N.D. Cal. 2023) ("A VPPA subscriber is not just someone who provides her name and address to a website, for some undisclosed purpose or benefit.").

A more recent decision by the D.C. Circuit, *Pileggi v. Washington Newspaper Publishing Co., LLC*, 146 F.4th 1219 (D.C. Cir. 2025), is also instructive.[9] There, the court rejected an argument that subscribing

---

[8] As noted, judicial notice is taken of the fact that www.bellesa.co offers some content that is freely available to all internet users, *i.e.*, not just users who have registered with www.bellesa.co. No determination is made as to whether registration is required to access video content on www.bellesaplus.co. However, the FAC does not distinguish between these websites; its allegations focus on access to the "Website," which is defined as both websites collectively. Dkt. 25 ¶ 4.

[9] The Supreme Court has granted *certiorari* in a case that presents the same question of statutory interpretation that is at issue in this action: whether a consumer must rent, buy, or subscribe to "audiovisual materials," as opposed to other, non-video "goods or services," to state a claim under the VPPA. *Salazar v. Paramount Glob.*,

for a newsletter offered by the defendant amounted to a "subscri[ption]" to "goods or services" under the VPPA. *Id.* at 1224, 1237. The defendant's actionable conduct under the VPPA involved data collection related to videos on its website, not the newsletter to which plaintiff had subscribed, and the videos on its website were accessible to *all* users on the internet. *Id.* Because there was no nexus between the plaintiff's subscription activity -- signing up for a newsletter -- and the audiovisual content that allegedly violated the VPPA, the D.C. Circuit held that the plaintiff had not "subscribe[d]" to the relevant "goods or services," and therefore, was not a "consumer" under the VPPA. *Id.* at 1237; *see also Salazar v. Paramount Glob.*, 133 F.4th 642, 653 (6th Cir. 2025) (a plaintiff was not a "consumer" under the VPPA where "the relevant videos were accessible to anyone, even those without a newsletter subscription, by going directly on [the website]."), *cert. granted*, No. 25-459, 2026 WL 189831 (U.S. Jan. 26, 2026). "[T]he videos for which viewing history is disclosed must be the same video materials or services that the individual purchased, rented, or subscribed to. Congress, in other words, did not protect every person who sees a video somehow." *Pileggi*, 146 F.4th at 1237.

Based on a review of the foregoing authorities, the interpretation of the VPPA followed by the Sixth Circuit and D.C. Circuit, as well as the majority of Ninth Circuit district courts, is adopted in this Order.

(2) <u>Application</u>

The FAC alleges that Plaintiffs registered for the Website. Dkt. 25 ¶¶ 17, 21. The FAC does not allege what information was shared through the registration process. However, there has been judicial notice that the registration process includes a form that requires a user to submit a username, an email, and a password. Dkt. 30-5. Further, as to how registration is related to video content, the FAC alleges that "[w]hile some of [the Website's] content can be viewed without paying for a subscription, any person who wishes to view even its free content must register for an account on the Website to gain access." Dkt. 25 ¶ 4. However, judicial notice has been taken of the fact that some content on the Website is viewable by any internet user, even one who has not registered for an account, which contradicts the FAC's allegations. *See Daniels-Hall*, 629 F.3d at 998 (allegations contradicted by judicially-noticed facts need not be accepted as true).

Based on the foregoing, it is accepted that any internet user can watch certain videos on the Website freely and without first creating any ongoing relationship with Defendant -- through the registration process or otherwise. Therefore, the FAC does not plausibly allege that Plaintiffs' registration on the Website was factually related to the alleged viewing of the videos by Plaintiffs. Consistent with *Pileggi*, district courts have rejected Plaintiffs' theory that they are "subscribe[rs]" to "goods or services" within

---

No. 25-459, 2026 WL 189831 (U.S. Jan. 26, 2026). There is a Circuit split on this issue. The Second and Seventh Circuits have held that a VPPA claim is cognizable even where the rental, purchase, or subscription is not of audiovisual materials. *See Salazar v. NBA*, 118 F.4th 533, 549 (2d Cir. 2024) (to become a statutory consumer, one must be "a renter, purchaser, or subscriber of any of [a video tape service] provider's 'goods or services'—audiovisual or not"); *accord Gardner v. Me-TV Nat'l Ltd. P'ship*, 132 F.4th 1022, 1025 (7th Cir. 2025) ("Any purchase or subscription from a 'video tape service provider' satisfies the definition of 'consumer', even if the thing purchased is clothing or the thing subscribed to is a newsletter."). In contrast, the Sixth Circuit and the D.C. Circuit each requires a nexus between the rental, purchase, or subscription activity and the audiovisual content at issue. *See Pileggi*, 146 F.4th at 1224; *Salazar v. Paramount Glob.*, 133 F.4th 642, 651–53 (6th Cir. 2025). This statutory interpretation question is also presented in *Heather v. Healthline Media, Inc.*, which the Ninth Circuit has held in abeyance pending the decision by the Supreme Court in *Salazar*. No. 24-4168, Dkt. 35 (9th Cir. Jan. 30, 2026).

the meaning of the VPPA just because they may have registered for a service unrelated to the videos at issue in a particular case. *See, e.g.*, *Kuzenski v. Uproxx LLC*, No. 23-CV-00945, 2023 WL 8251590, at *5 (C.D. Cal. Nov. 27, 2023) ("Nowhere in the FAC does Plaintiff allege that becoming a subscriber is connected in any way to Defendant's video content."); *Gardener v. MeTV*, 681 F. Supp. 3d 864, 869 (N.D. Ill. 2023) ("The Court does not agree, however, with Plaintiffs' argument that the allegations that [they] opened an account separate and apart from viewing video content on MeTV's website is sufficient to render them 'subscribers' under the Act."); *Carter*, 670 F. Supp. 3d at 99 ("[A] customer's non-video transactions play no part in a defendant's liability under the VPPA."); *Alex v. NFL Enters. LLC*, No. 22-CV-09239, 2023 WL 6294260, at *3 (S.D.N.Y. Sep. 27, 2023) ("Plaintiffs' viewing of public content on the provider's website is not enough to qualify as a consumer under the VPPA."). Because the VPPA is not intended to "protect every person who sees a video somehow," Plaintiffs have failed plausibly to allege that they are "subscribe[rs]" of "goods or services," which is required to sue as a "consumer[]" under the meaning of the VPPA. *Pileggi*, 146 F.4th at 1237.

Plaintiffs' arguments to the contrary are unpersuasive. Dkt. 35 at 20–23. *First*, the district court cases on which Plaintiffs rely are distinguishable. None addressed a factual circumstance where registering for a service was not causally related to viewing the video content on which a VPPA claim was predicated. That is the issue presented by the allegations of the FAC. *See Jackson v. Fandom, Inc.*, No. 22-CV-04423, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023); *Ade v. Viki, Inc.*, No. 23-CV-02161, 2024 WL 1880153, at *1 (N.D. Cal. Mar. 28, 2024); *In re Hulu Priv. Litig.*, No. 11-CV-03764, 2012 WL 3282960, at *8 (N.D. Cal. Aug. 10, 2012); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 722 (N.D. Cal. 2023); *Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023); and *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 254 (S.D.N.Y. 2025). Further, some of these cases are not consistent with the allegations in the FAC because they presented claims that clearly linked registration on a website and the ability of a person to access the video content on which the VPPA claim was based. *See Ade*, 2024 WL 1880153, at *1 ("[T]he Viki membership gave the plaintiffs access to video content online . . . ."); *Lee*, 769 F. Supp. 3d at 254 ("[U]sers were required to become subscribers in order to watch more than three videos on the Website."). Similarly, *Markels* held that the plaintiffs were not subscribers based on allegations that parallel those in the FAC: "[T]he videos [were] readily available to anyone who visits the site," and therefore, the plaintiffs had failed plausibly to allege a sufficient "nexus between the plaintiff and defendant and the video content provided." 689 F. Supp. 3d at 728.

*Second*, Plaintiffs' contention that Defendant has not established that "*every* video" on the Website is freely available without registration, is not a sufficient basis to show that the VPPA claims in the FAC are viable. Dkt. 35 at 22–23. Plaintiffs must plausibly allege that they are "subscriber[s] of goods or services" to be "consumers" within the meaning of the VPPA. Because Plaintiffs have made no plausible allegation that ties their registration with the Website to their ability to view the videos they actually watched, the FAC falls short.[10] Therefore, because the FAC "does not include facts that

[10] Even assuming, *arguendo*, that not all videos on the Website are freely available to unregistered users, the FAC still does not plausibly allege that Plaintiffs have "subscribe[d]" to "goods or services" as defined by the VPPA. For example, even if had been alleged in the FAC that access to only half of the videos on the Website requires prior registration, it has not been alleged that Plaintiffs in fact viewed one or more of these videos following their registration. Accordingly, the allegation that Plaintiffs registered on the Website is not, itself, sufficient to state a VPPA claim without further allegations that the videos they watched were related to their

plausibly allege that [Plaintiffs'] status as" registrants on the Website "was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience," it does not sufficiently allege that Plaintiffs are consumers under the VPPA. *Carter*, 670 F. Supp. 3d at 99.

b) Whether Plaintiffs' Personally Identifiable Information Was Disclosed

To state a prima facie case under the VPPA, a plaintiff must allege the following: (1) the defendant is a "video tape service provider;" (2) the defendant disclosed "personally identifiable information concerning any consumer" to "any person;" (3) the disclosure was made knowingly; and (4) the disclosure was not authorized by § 2710(b)(2). *See Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015) (citing 18 U.S.C. §§ 2710(b)). Defendant argues that the allegations in the FAC do not satisfy the second element because they do not plausibly allege that Defendant disclosed Plaintiffs' personally identifiable information ("PII"). Dkt. 30-1 at 16–19. Plaintiffs respond that the allegations in the FAC about the use of the Google Pixel on the Website are sufficient to state that Defendant disclosed PII to Google. Dkt. 35 at 14–20.

(1) Legal Standard

The VPPA defines PII as "information which identifies a person as having requested or obtained specific video materials or services from a video tape services provider." 18 U.S.C. § 2710(a)(3). Information is PII if it is "'capable of' identifying a person, as well as information that, standing alone, identifies a person." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017). Whether information is "capable of" identifying a person depends on an "ordinary person" standard. *Id.* at 985. Under this standard, PII is only the kind of "information that would 'readily permit an ordinary person to identify a specific individual's video-watching behavior.'" *Id.* at 985 (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)).

Under *Eichenberger*, information that could be used to identify a person is within a "spectrum":

> At one end of the spectrum, of course, is a person's actual name. Then there are pieces of information, such as a telephone number or a physical address, which may not by themselves identify a particular person but from which it would likely be possible to identify a person by consulting publicly available sources, such as a phone book or property records. Further down the spectrum are pieces of information, like social security numbers, which are associated with individual persons but might not be easily matched to such persons without consulting another entity, such as a credit reporting agency or government bureau.
>
> The kind of information at issue here—static digital identifiers—falls even further down the spectrum. To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person.
>
> . . .

registration, *i.e.*, that they were not equally accessible to any unregistered user. Therefore, Plaintiffs have not plausibly pleaded more than a "sheer possibility" that they are consumers under the VPPA. *Iqbal*, 556 U.S. at 678.

> If an IP address were to count as personally identifiable information, either standing alone or coupled with similar data points, then the disclosure of an IP address to *any* Internet company with registered users might trigger liability under the [VPPA]. . . . We do not think the Video Privacy Protection Act sweeps quite so broadly.

*Nickelodeon*, 827 F.3d at 282–83, 290; *see also Eichenberger*, 876 F.3d at 985 (adopting *Nickelodeon*'s standard for PII).

The ordinary person standard emphasizes the nature of the information disclosed "from the perspective of the disclosing party," rather than the recipient of the disclosure. *Eichenberger*, 876 F.3d at 985 (PII "looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it."). Under this ordinary-person standard, PII has "the same meaning without regard to its recipient's capabilities." *Id.*

Applying this standard in *Eichenberger*, the Ninth Circuit held that ESPN's disclosure of the serial number of the plaintiff's Roku device, along with video names, to a third party, Adobe, did not constitute the disclosure of PII. *Eichenberger*, 876 F.3d at 985–86. The basis for this determination was that an ordinary person would not be able to identify the plaintiff based on a serial number. Instead, only a more sophisticated individual, such as a private investigator, would have access to the resources necessary to identify a person using the serial number disclosed by ESPN. *Id.* at 985. The Ninth Circuit acknowledged that Adobe could have identified the plaintiff based on a combination of the information disclosed by ESPN and "other data in Adobe's possession." *Id.* at 986. Notwithstanding this recognition, it was determined that the serial number disclosed was not PII because it could not be used to identify the plaintiff without an "enormous amount of information" collected by Adobe "from a variety of sources" -- which was beyond the ability of an "ordinary person." *Id.*

(2) <u>Application</u>

It is undisputed that Plaintiffs have alleged that their data was disclosed to *Google* in the form of cookies and device and browser information. Dkt. 30-1 at 17–18. However, Defendant contends that, even if Plaintiffs have alleged that *Google* can identify them based on the data disclosed by the Website, the FAC fails to allege that "anyone other than Google actually can do so." *Id.* at 19. Because the FAC alleges only that Google, which the FAC characterizes as an "online surveillance 'behemoth,'" is capable of identifying them based on the data about them that was shared by Defendant, it argues an "ordinary person" under *Eichenberger* could not use the information captured by the Website and disclosed to Google to identify Plaintiffs as persons who accessed certain videos. *Id.* at 10.

The FAC alleges that the Google Pixel captures and discloses to Google information about the title of any video being watched on the Website. Dkt. 25 ¶ 69. The Google Pixel also transmits an "identifier number" that is "attached" to the "cid" and "sid" cookies maintained by Google, which can be used by Google to deanonymize users. *Id.* ¶ 70. In an "exemplar" of the "back-end network traffic" -- which consists of information captured and disclosed by the Google Pixel installed on the Website -- the information transmitted through the "cid" and "sid" cookie is, respectively, the following strings of code: 1055617703.1744844018 and 1745897236. *Id.* at 19 fig.1. The FAC also alleges that a user's browser

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-05099-JAK (MARx) | Date | July 14, 2026 |
| Title | D.B., et al. v. Bellesa Enterprises US, Inc. | | |

information, including language preferences, screen resolution, and software, are transmitted to Google to permit Google to create a "fingerprint" for the user. *Id.* ¶ 70.

The following is the FAC's "exemplar" screenshot capturing data disclosed by the Website to Google by means of the Google Pixel:




*Id.*

In light of the foregoing, the allegations in the FAC do not plausibly allege than an "ordinary person" under *Eichenberger* could identify Plaintiffs and their video-watching activity based on this information. As an initial matter, the FAC is without "any details" about how an ordinary person might access this "back-end" network traffic. *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 54 (2d Cir. 2025) (observing that an ordinary person might not be able to access the network traffic where PII was allegedly disclosed in the first instance), *cert. denied*, No. 25-228, 2025 WL 3506993 (U.S. Dec. 8, 2025). Even assuming that an ordinary person could access this "back-end" page, the FAC does not plausibly allege how such an ordinary person would use these strings of code to identify Plaintiffs and their video-watching activities. "To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person." *Nickelodeon*, 827 F.3d at 283.

In their opposition to the Motion, Plaintiffs provide no basis to conclude that the allegations of the FAC are sufficient to allege that an ordinary person would be able to use strings of code like "1055617703.1744844018" and "1745897236" to identify Plaintiffs. Nor do Plaintiffs argue that an ordinary person could identify them using the information disclosed by the Google Pixel. Rather, Plaintiffs argue only that "the Google ID numbers disclosed . . . allow *Google* to identify their Google accounts . . . ." Dkt. 35 at 17 (emphasis added). Such allegations do not satisfy the "ordinary person" test set forth in *Eichenberger* because "information that only a sophisticated technology company could use" to identify a person is not PII within the meaning of the VPPA. *Solomon*, 136 F.4th at 52.

Plaintiffs rely on several district court decisions finding that information disclosed by the Facebook Pixel is PII (Dkt. 35 at 17–18), but those cases are distinguishable.[11] Plaintiffs argue that "[m]ost, if not all, courts to address the question have found at the pleading stage that Facebook IDs are PII." *Ghanaat*, 689 F. Supp. 3d at 720 (footnote omitted). However, the Second Circuit recently held that, because a Facebook ID is analogous to the device serial numbers in *Eichenberger*, an ordinary person could not use a Facebook ID to identify a user. *Solomon*, 136 F.4th at 54–55. Even assuming, contrary to *Solomon*, that Facebook IDs are PII, Plaintiffs' reliance on cases involving the Facebook Pixel would remain unpersuasive because this case involves the Google Pixel. As Defendant argues, the Facebook Pixel, which discloses Facebook IDs, involves meaningfully different technology from the Google Pixel at issue in this action. Dkt. 39 at 8–9. It is plausible that Facebook ID numbers may be readily used by an "ordinary person" to identify a person because a person's Facebook profile, which ordinarily contains a person's name, can be accessed by appending their Facebook ID to the facebook.com URL. *See Cole v. LinkedIn Corp.*, 807 F. Supp. 3d 959, 962 (N.D. Cal. 2025) ("By appending that Facebook ID to the URL 'facebook.com,' any person may view the user's Facebook profile 'and all personal information publicly listed on that profile.'"); *Heerde v. Learfield Commc'ns*, LLC, 741 F. Supp. 3d 849, 857 (C.D. Cal. 2024) (same); *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 772–73 (N.D. Cal. 2025) (the disclosure of the plaintiff's Facebook ID constituted disclosure of PII because any person who obtains the plaintiff's Facebook ID can locate his Facebook profile and the plaintiff's real name was listed on his Facebook page); *see also In re Hulu Priv. Litig.*, No. 11-CV-03764, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID is more than a unique, anonymous identifier. It personally identifies a Facebook user. That it is a string of numbers and letters does not alter the conclusion. Code is a language, and languages contain names, and the string is the Facebook user name.").

[11] At the hearing, Plaintiffs emphasized that *Edwards v. MUBI, Inc.*, 773 F. Supp. 3d 868 (N.D. Cal. 2025) held that a pixel operated by X (formerly known as Twitter) disclosed PII. However, the relevant VPPA analysis in *Edwards* centered on the Facebook Pixel. *Id.* at 878–79. The X Pixel was analyzed only with respect to state law claims, not the VPPA. *Id.* at 885.

The data allegedly collected by the Google Pixel is different. It consists of anonymous, indecipherable strings of code that, on their face, do not show any relationship to the identities of Plaintiffs or explain how to make that connection. Dkt. 25 ¶¶ 69–70. The FAC does not allege that these strings of code are connected to something comparable to a Facebook profile -- a connection that an "ordinary person" could use to link the code to a particular person. Therefore, the information allegedly collected and disclosed by the Google Pixel is not information that an ordinary person, other than Google, could use to identify Plaintiffs.[12] As noted, Google's ability to identify Plaintiffs using this code is immaterial under the VPPA because PII does not include information "that only a sophisticated technology company could use" to identify an individual and their video-watching activity. *Solomon*, 136 F.4th at 52; *see also Eichenberger*, 876 F.3d at 985.

Plaintiffs' remaining arguments do not change the analysis. *First*, Plaintiffs argue that the information disclosed about them to Google is "unique." Dkt. 35 at 19. That is immaterial under the ordinary person standard established in *Eichenberger*. *See Solomon*, 136 F.4th at 43, 54–55 (applying *Eichenberger* to find that Facebook IDs are not PII because, even though they are unique strings of code, it was implausible that an ordinary person would be able to use the code to identify a user); *Nickelodeon*, 827 F.3d at 282, 290 (browser and operating system identifiers were not PII even though plaintiffs alleged that the odds of two people having the same combination of data was 1 in 286,777).

*Second*, Plaintiffs do not successfully distinguish *Eichenberger*. Dkt. 35 at 15–16. Plaintiffs emphasize that, in *Eichenberger*, the serial numbers were not disclosed to Roku, but rather, to a third party, Adobe, who could use that information to identify users only by connecting the serial numbers to other information that Adobe already had. *Id.* This case is different, according to Plaintiffs, because Defendant disclosed Plaintiffs' information not to a third party, but to Google, which is capable of using the information to identify Plaintiffs. *Id.* However, as already noted, Google's capabilities are immaterial because PII does not include "information that only a sophisticated technology company could use" to identify a person. *Solomon*, 136 F.4th at 52. Moreover, as in *Eichenberger*, Google is allegedly able to identify Plaintiffs only by using information that it obtains "from sources other than" Defendant, in combination with the information disclosed by the Website. *Eichenberger*, 876 F.3d at 981, 985–86 (although Adobe could "identify individuals," the information disclosed to Adobe was not PII because Adobe used a complex technique to "to link [the information disclosed] with other identifying information derived from 'an enormous amount of information' collected 'from a variety of sources'," including sources other than the defendant that disclosed the information to Adobe); Dkt. 25 ¶¶ 66, 70 (describing process by which Google "links" information disclosed to class members' identities by "compil[ing] user data over time" not just on one website, but "across the internet"). The VPPA does not create liability where a third party like Google is able to "assemble otherwise anonymous pieces of data to unmask the identity of individual [users]." *Nickelodeon*, 827 F.3d at 290; *see also Eichenberger*, 876 F.3d at 985 ("'[P]ersonally identifiable information' must have the same meaning without regard to its recipient's capabilities. Holding otherwise would make 'the lawfulness of a disclosure depend on circumstances outside of a video service provider's control.'" (citation modified) (quoting *Mollett*, 795 F.3d at 1066)).

---

[12] Plaintiffs contend that Google and Meta's tracking software function "in the same manner." Dkt. 35 at 18 n.2. The FAC does not make this allegation. Moreover, the cases on which Plaintiffs rely to support this position did not involve the application of the VPPA. *See generally Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814 (E.D. Cal. 2025); *I.T. v. ChoicePoint LLC*, No. C25-00193, 2025 WL 2495079 (W.D. Wash. Aug. 29, 2025).

*Third*, Plaintiffs' attempt to analogize this action to *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482 (1st Cir. 2016) is unpersuasive. Dkt. 35 at 16. As the Ninth Circuit observed, *Yershov*, "relied, in part, on the nature of GPS location data, which the court noted 'would enable *most people* to identify [an individual's home and work addresses].'" *Eichenberger*, 876 F.3d at 986 (quoting *Yershov*, 820 F.3d at 486). *Yershov* "expressly noted that, at some point, 'the linkage of information to identity becomes too uncertain' to trigger liability under the VPPA.'" *Id.* (quoting *Yershov*, 820 F.3d at 486). And because the information at issue is meaningfully different from GPS location data, as in *Eichenberger*, "[t]hat is precisely the situation here." *Id.*

*Fourth*, Plaintiffs argue that there is a question of fact as to whether an ordinary person might identify Plaintiffs based on the information disclosed because *Eichenberger* recognized that "modern technology may indeed alter—or may have already altered—what qualifies under the [VPPA]." Dkt. 35 at 19 (quoting *Eichenberger*, 876 F.3d at 986). This argument is unpersuasive. *Eichenberger* recognized that, based on technological development, a "Facebook link or an email address may very well" constitute PII in the future if an ordinary person could use that data to identify a person. *Eichenberger*, 876 F.3d at 986. However, Facebook links and email addresses are readily distinguishable from the anonymous strings of code at issue here. Nor have Plaintiffs proffered anything more than speculation to suggest that there could be a triable issue as to whether Defendant disclosed Plaintiffs' PII. Accordingly, based on the allegations in the FAC, the disclosed information is not PII as a matter of law because no ordinary person could identify Plaintiffs using it.

* * *

For those reasons, the Motion is **GRANTED WITH PREJUDICE** as to Count V, *i.e.*, without leave to amend. Because the information collected and disclosed by the Google Pixel is not PII as a matter of law under *Eichenberger*, it would be futile to grant leave to amend. There is no set of facts on which Plaintiffs could plausibly state a claim under the VPPA. *See, e.g.*, *Taino v. Bow Tie Cinemas, LLC*, No. 23-CV-5371, 2025 WL 2652730, at *8 (S.D.N.Y. Sep. 16, 2025) (following *Solomon*, denying leave to amend where Plaintiffs could not allege that PII was disclosed by the Facebook Pixel). Futility is confirmed based on Plaintiffs' previous amendment, which failed to address the deficiencies with the VPPA claim identified in Enterprises' first motion to dismiss. *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A district court's discretion to deny leave to amend is 'particularly broad' where the plaintiff has previously amended." (quoting *Sisseton-Wahpeton Sioux Tribe v. United States,* 90 F.3d 351, 355 (9th Cir. 1996))).

2. <u>California Statutory Claims (Counts VIII and IX)</u>

Defendant argues that Plaintiffs' claims, arising under CIPA (Count VIII) and the UCL (Count IX), fail because those statutes do not apply outside of the state. Dkt. 30-1 at 20–21. Further, Defendant argues that Plaintiffs lack standing under the UCL. Dkt. 30-1 at 25–26. Plaintiffs do not address these arguments in their opposition to the Motion. Moreover, at the hearing, Plaintiffs conceded that Counts VIII and IX failed to state a claim.

A plaintiff's failure to address an argument in opposition to a motion to dismiss amounts to a concession that such claims should in fact be dismissed. *See Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1035, 1037 (9th Cir. 2006) (where the plaintiff's opposition to a motion to dismiss failed to

"address any of the arguments presented" in the defendant's motion to dismiss, "the district court had no reason to consider the contention" that the claim in question "could not be dismissed," and the plaintiff "effectively abandoned the claim"); *Pers. Elec. Transports, Inc. v. Office of U.S. Tr.*, 313 F. App'x 51, 52 (9th Cir. 2009) ("[T]he district court correctly opined that Appellants had waived their . . . argument for failing to raise it in their opposition to the Trustee's motion to dismiss."). Plaintiffs have also expressly conceded that Counts VIII and IX should be dismissed. *See Homsy v. Bank of Am., N.A.*, No. 13-CV-01608, 2013 WL 2422781, at *5 (N.D. Cal. June 3, 2013) ("In instances where a plaintiff simply fails to address a particular claim in its opposition to a motion to dismiss that claim, courts generally dismiss it with prejudice.").

Even absent waiver by Plaintiffs, Defendant's arguments are persuasive on the merits. Plaintiffs are not residents of California, and have not alleged that any of Defendant's conduct occurred in California. Accordingly, for Plaintiffs' CIPA claim, Plaintiffs have not adequately alleged that any communication was "sent from, or received at any place within" California. Cal. Pen. Code § 631. Plaintiffs' UCL claim has similar shortcomings. *See Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1094 (N.D. Cal. 2019) ("It is well-established that the UCL does not apply extraterritorially."); *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222–23 (1999) (the UCL does not reach "claims of non-California residents injured by conduct occurring beyond California's borders").

Plaintiffs also have not adequately alleged UCL standing because, although the FAC alleges that Plaintiffs' data has some abstract economic value, it does not adequately allege that Defendant's use of that data caused Plaintiffs economic injury. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013) (UCL standing requires "plaintiff to demonstrate 'some form of economic injury' as a result of his transactions with the defendant"); *Griffith v. TikTok, Inc.*, 697 F. Supp. 3d 963, 977 (C.D. Cal. 2023) (finding no economic injury where plaintiff "generally alleges that internet users' personal information and search data may be monetized" but did "not allege specific facts showing that she could have sold the limited data collected by the TikTok SDK through the three identified websites, that she has ever attempted or intended to sell her data, or that Defendants' collection of that data, without more, has impeded her ability to sell her data").

For those reasons, the Motion is **GRANTED WITH PREJUDICE** as to Counts VIII and IX, *i.e.*, without leave to amend as to D.B. and B.S. Because this is a putative class action, however, Plaintiffs may seek to amend the FAC to add new named plaintiffs, with a sufficient nexus to California, in an effort to address the present shortcomings as to these California statutory claims. Therefore, in the Second Amended Complaint ("SAC"), Counts VIII and IX may be advanced only if they are asserted by a new, named plaintiff who has a sufficient nexus to California to address the legal deficiencies identified in this Order.

3. <u>Consent (Counts VI and VIII)</u>

Defendant argues that Plaintiffs' ECPA claim (Count VI) and CIPA claim (Count VIII) fail because Plaintiffs consented to Defendant's data collection and disclosures. Dkt. 30-1 at 22–25. Specifically, Defendant contends that the data collection and disclosure practices challenged by Plaintiffs were adequately disclosed in the Terms of Service and the Privacy Policy, of which Plaintiffs were given sufficient notice and to which Plaintiffs manifested assent. *Id.* Plaintiffs respond that the Terms of

Service and Privacy Policy did not adequately disclose the practices to which Plaintiffs object, and therefore, any purported consent is invalid. Dkt. 35 at 12–13.

a) Legal Standards

Consent is a complete defense to ECPA and CIPA liability. *See* 18 U.S.C. § 2511(2)(d) (ECPA) (providing that it is not "unlawful . . . for a person . . . to intercept a[n] . . . electronic communication . . . where one of the parties to the communication has given prior consent to such interception"); Cal. Pen. Code §§ 631(a), 632(a) (CIPA) (prohibiting wiretapping and eavesdropping "without the consent of all parties to the communication"). "Consideration of consent is appropriate on a motion to dismiss where lack of consent is an element of the claim." *Snyder v. G6 Hosp. LLC*, No. 24-CV-02423, 2025 WL 2426613, at *2 (C.D. Cal. Aug. 18, 2025) (cleaned up) (quoting *Silver v. Stripe Inc.*, No. 20-CV-08196, 2021 WL 3191752, at *2 (N.D. Cal. July 28, 2021)); *see also Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (affirming dismissal of complaint based on consent).

Consent "can be explicit or implied, but any consent must be actual." *In re Google, Inc.*, No. 13-MD-02430, 2013 WL 5423918, at *12 (N.D. Cal. Sep. 26, 2013). In order for consent to be actual, the disclosures must "explicitly notify" users of the practice at issue. *Id.* at *13; *see also Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847–48 (N.D. Cal. 2014) (for a finding of consent, the disclosures must have given users notice of the "specific practice" at issue). The disclosures must have only one plausible interpretation to support a consent defense. *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019). "[I]f a reasonable . . . user could plausibly have interpreted the contract language as *not* disclosing that [the defendant] would engage in particular conduct, then [the defendant] cannot obtain dismissal of a claim about that conduct . . . based on the issue of consent." *Id.* at 789–90.

b) Application

The parties dispute whether the Privacy Policy, which is incorporated by reference in the Terms of Service, sufficiently discloses the conduct at issue. Defendant contends that Plaintiffs were on "express notice" that their information would be collected and disclosed by the Google Pixel based on the Privacy Policy. Dkt. 30-1 at 25. In response, Plaintiffs argue that, even if they agreed to the Privacy Policy by consenting to the Terms of Service during the registration process, the express terms of the Privacy Policy failed to disclose the practices challenged here. Dkt. 35 at 12–13. Specifically, Plaintiffs contend that, although the Privacy Policy identifies certain circumstances under which Defendant is permitted to provide personal information to third parties, Defendant violated the Privacy Policy by sharing Plaintiffs' data with Google outside of those narrow circumstances. *Id.* Moreover, Plaintiffs argue that the Privacy Policy does not disclose, with adequate specificity, the use of cookies, pixels, Google Analytics, or other tracking tools. *Id.* at 13.

The Privacy Policy states clearly that Defendant does "not track information that would render an individual personally identifiable, unless that user willingly supplies that information" to Defendant. Dkt. 30-4 at 2. Although the Privacy Policy states that Defendant "may also track usage of/engagement with"

the Website, the Privacy Policy contains the following strict limitations on the disclosure of such data to third parties:

> *We do not sell or redistribute personal information*. *Unless you consent in writing* or unless disclosure is required by law, *we will not disclose your personal information to any third party except as provided below*:
>
> *To third party service providers with assurance that such third party service providers use the personal information only as is required to perform the task they have been retained for, and agree to follow policies compliant with privacy laws;*
> To comply with any legal requirements;
> To enforce our privacy policy, or to protect your safety and security while visiting our website;
> We may also disclose personal information to third parties in connection with a corporate reorganization, merger or amalgamation, or the sale of all or substantially all of our assets, provided that the personal information disclosed continues to be used for the purposes permitted by this Privacy Policy by the entity acquiring this information; or
> To any other third parties, with your consent to such collection, use or disclosure.

*Id.* at 3 (emphasis added).

Although the Privacy Policy discloses that user engagement may be tracked on the Website, it does not specifically disclose that Defendant would allow third parties, *e.g.,* Google, to install tracking software on the Website, that specific analytics and cookies would be used and that user identifiers and other similar data connected to the use of the Website would be collected and shared with Google. To the contrary, the general theme of the Privacy Policy is that personal information will not be redistributed, unless certain narrow exceptions are satisfied. Thus, the Privacy Policy failed "explicitly [to] notify" Plaintiffs of the challenged data collection and disclosure practices. *See In re Google*, 2013 WL 5423918, at *13; *Campbell*, 77 F. Supp. 3d at 847–48 (for a finding of consent, the disclosures must have given users notice of the "specific practice" at issue).

In support of the Motion, Defendant has not addressed the actual language of the Privacy Policy in a meaningful manner. Rather, Defendant cites certain limited portions of the Privacy Policy to argue that it adequately informs users of the "potential disclosure of 'personal information' '[t]o third party service providers,' such as Google." Dkt. 30-1 at 25. This argument -- that the first exception in the Privacy Policy, which concerns "third party service providers," adequately discloses Defendant's alleged conduct -- lacks merit.

The full text of the first exception permits the disclosure of data "[t]o third party service providers with assurance that such third party service providers use the personal information only as is required to perform the task they have been retained for, and agree to follow policies compliant with privacy laws." Dkt. 30-4 at 3. Whether this exception, drawing all reasonable inferences in the light most favorable to Plaintiffs, sufficiently discloses the use of the Google Pixel on the Website cannot be resolved at the motion to dismiss stage. The applicability of this exception turns on whether Google is a "third party service provider[]," whether Google has been "retained for" a "task" by Defendant, and whether Google agreed with Defendant "to follow policies compliant with privacy laws" -- all of which are questions of

fact inappropriate for resolution on a motion to dismiss. Because this exception plausibly could be understood as not disclosing the challenged conduct, a finding that Plaintiffs consented to Defendant's conduct is not appropriate in connection with the Motion. *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 789–90 ("[I]f a reasonable . . . user could plausibly have interpreted the contract language as *not* disclosing that [the defendant] would engage in particular conduct, then [the defendant] cannot obtain dismissal of a claim about that conduct . . . based on the issue of consent.").

For similar reasons, the district court cases cited by Defendant in support of its consent argument are distinguishable. Dkt. 30-1 at 25; Dkt. 39 at 11–12. In those cases, the specific contractual language at issue adequately disclosed the challenged practices. *See Libman*, 2024 WL 4314791, at *8 ("Plaintiffs do not dispute they received sufficient notice of the collection."); *Lakes*, 777 F. Supp. 3d at 1056 ("Defendant's disclosures clearly disclose that it allows partners to use cookies on the Website, that specific analytics and personalization cookies would be used, and that cookie identifiers and other similar data connected to the use of the site could be collected and shared."); *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1130 (N.D. Cal. 2015) (privacy policy stated that the "[defendant] may share your personal information with our agents, representatives, contractors and service providers so they can provide us with support services such as email origination, receipt or support services, customer relationship management services, and order fulfillment" (emphasis omitted)).

As noted, the contractual language at issue here is materially different. It does not disclose, in any meaningful way, that Defendant will use the Google Pixel and correspondingly disclose data to Google. For that reason, the cases distinguished in *Lakes* -- which involved incomplete disclosures similar to those at issue here -- are more analogous and persuasive. *See Calhoun v. Google, LLC*, 113 F.4th 1141, 1150 (9th Cir. 2024) ("[W]hen the disclosures are read together and in the light most favorable to Plaintiffs, a reasonable user would not necessarily understand that they were consenting to the data collection at issue."); *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1064–68 (N.D. Cal. 2021) (rejecting consent to collection of data during private browsing where privacy policy did not mention the collection of data in private browsing); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793–94 (N.D. Cal. 2022) (rejecting a consent defense where generalized privacy notice did not put users on notice that defendant was collecting sensitive health information).

Because Defendant has not shown that the conduct at issue was expressly and clearly disclosed to Plaintiffs based on a reasonable user's interpretation of the Privacy Policy, it would be inappropriate to make a finding of consent at the motion to dismiss stage. Accordingly, whether Plaintiffs received sufficiently conspicuous notice of and manifested assent to the Terms of Service and the Privacy Policy need not be decided.

* * *

For those reasons, and based solely on the allegations in the FAC and other material subject to judicial notice or incorporated by reference, Defendant has not shown that Plaintiffs consented to the challenged conduct. Because Defendant has not raised any other challenges to Plaintiffs' ECPA claim (Count VI), the Motion is **DENIED** as to Count VI. Although the consent defense does not bar Plaintiffs' CIPA claim (Count VIII), that claim has already been dismissed for the reasons stated above.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-05099-JAK (MARx) | Date | July 14, 2026 |
| Title | D.B., et al. v. Bellesa Enterprises US, Inc. | | |

4. New York GBL § 349 (Count VII)

Defendant argues that Plaintiffs' New York GBL § 349 claim fails because Plaintiffs only identify in conclusory terms the specific statements allegedly made by Defendant that were misleading. Dkt. 30-1 at 27. Defendant also argues that Plaintiffs cannot establish a GBL § 349 claim by omission because Defendant adequately disclosed all material information to Plaintiffs. *Id.* Plaintiffs respond that they have adequately alleged the elements of a GBL § 349 claim. Dkt. 35 at 24–25.

The GBL prohibits "[d]eceptive" or "abusive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). To state a claim under the GBL, a plaintiff must allege "that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020). "Whether a representation or an omission, the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995)). "[W]hen a defendant exclusively possesses information that a reasonable consumer would want to know and could not discover without difficulty, failure to disclose can constitute a deceptive or misleading practice." *Woods v. Maytag Co.*, No. 10-CV-0559, 2010 WL 4314313, at *15 (E.D.N.Y. Nov. 2, 2010).

The FAC adequately alleges a violation of GBL § 349 based on Defendant's omissions.[13] It alleges that Defendant collected and disclosed Plaintiffs' personal information without consent -- a practice that Defendant allegedly failed to disclose to Plaintiffs prior to their use of the Website. Dkt. 25 ¶¶ 71, 73. Because Defendant's consent argument has been rejected at this time, these allegations are sufficient to state a claim under GBL § 349. *See Nick v. Target Corp.*, No. 15-CV-4423, 2017 WL 10442061, at *4 (E.D.N.Y. Sep. 13, 2017) (GBL § 349 claim based on omissions was adequate where plaintiffs alleged that they provided their data to defendant with consent for one purpose, but defendant used it for other purposes for which no adequate disclosures were made); *Doe v. GoodRx Holdings, Inc.*, No. 23-CV-00501, 2025 WL 2052302, at *13 (N.D. Cal. July 22, 2025) ("Such sharing of medical information without consent may constitute a deceptive act actionable under the GBL."); *see also Afriyie v. NBCUniversal Media, LLC*, 775 F. Supp. 3d 791, 812 (S.D.N.Y. 2025) ("[A] plaintiff could possibly be able to plead an actionable claim under GBL section 349 for failure to disclose data sharing practices even if the data being shared is not PII under the VPPA or VCPA. For example, a plaintiff might argue that a defendant lied about what categories of data it shared with third parties, regardless of whether

---

[13] Plaintiffs' affirmative misrepresentation theory of GBL § 349 liability is not sufficiently alleged. The FAC does not identify or state the alleged affirmative statements made by Defendant that were false or likely to mislead a reasonable consumer. *See Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 287 (S.D.N.Y. 2023) ("[P]laintiff does not explain how any of the defendants engaged in any materially misleading conduct through People.com's use of the Facebook Pixel."). Plaintiffs' argument, Dkt. 35 at 24, that Defendant violated the "explicit promises" contained in the Privacy Policy is immaterial, as those allegations are not advanced in the FAC. *Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1126 (C.D. Cal. 2015) ("[I]t is improper for a plaintiff to assert an unpled theory of liability in opposition to a defendant's Rule 12(b)(6) motion to dismiss."). If the SAC asserts a GBL § 349 claim based on affirmative misrepresentations, it shall conform to these requirements in seeking to allege that any affirmative statements were false or misleading.

such data was PII and whether such data enabled third parties to identify particular individuals who watched specific videos.").

For those reasons, the Motion is **DENIED** as to Count VII.

5. Common Law Causes of Action

The parties appear to disagree on the state whose common law governs these causes of action. Defendant states that it assumes, without conceding, that Washington law applies to D.B.'s common law causes of action, and New York law applies to B.S.'s common law causes of action, based on where each allegedly resides. Dkt. 30-1 at 23 n.11. Plaintiffs appear to assume that California law applies. Dkt. 35 at 25–30 (applying California law and urging the Court to reject caselaw from Washington federal district courts). Neither party provides a choice-of-law analysis.

Plaintiffs are not residents of California, Plaintiffs were not injured in California, the challenged conduct did not occur in California, and Defendant is not incorporated in California. Accordingly, there is not presently a sufficient basis to show that California law would apply under California choice of law principles. *See Norwest Mortg.*, 72 Cal. App. 4th at 227 (California law could not be applied to the claims of plaintiffs who were not residents of California, notwithstanding that the defendant was incorporated in California, because the conduct did not occur in California, the plaintiffs were not injured in California, and the defendant's principal place of business was not in California). However, a final determination as to choice-of-law can be deferred because California law, Washington law, and New York law are substantially similar as to the issues that have been presented at this stage of the proceedings.

However, for clarity in future proceedings, in the SAC, Plaintiffs must specify, for each common law claim asserted, the particular state law under which each cause of action arises, and do so for each Plaintiff, Class or Subclass.

a) Common Law Invasion of Privacy (Count I)

Defendant argues that Plaintiffs' consent bars their invasion of privacy claim. Dkt. 30-1 at 27–28. Defendant also argues that New York law does not recognize invasion of privacy as an actionable tort. *Id.* at 28.

Because Defendant's consent argument has been rejected at this time for the reasons stated earlier, the Motion is **DENIED** as to Count I to the extent that this claim arises under California or Washington law. However, New York law does not recognize invasion of privacy as an actionable common law tort. *See Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 123 (1993) ("[I]n this State the right to privacy is governed exclusively by sections 50 and 51 of the Civil Rights Law; we have no common law of privacy."). Therefore, the Motion is **GRANTED WITH PREJUDICE**, *i.e.*, without leave to amend, as to Count I to the extent that this claim arises under New York law.

b) Common Law Negligence (Count II)

Defendant argues that Plaintiffs' consent defeats their negligence claim. Dkt. 30-1 at 28–29. Because that argument has been rejected at this time for the reasons stated earlier, the Motion is **DENIED** as to Count II.

c) Common Law Breach of Implied Contract (Count III)

Defendant argues that Plaintiffs' allegations are conclusory and lack sufficient factual support to state a claim for breach of implied contract. Dkt. 30-1 at 29–30. Plaintiffs respond that the allegations are sufficient. Dkt. 35-1 at 26–28.

The principles that apply are the same under New York, California and Washington law. "An implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civ. Code § 1621. "An implied contract consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words. In order to plead a cause of action for implied contract, the facts from which the promise is implied must be alleged. A course of conduct can show an implied promise." *Cal. Emergency Physicians Med. Grp. v. PacifiCare of Cal.*, 111 Cal. App. 4th 1127, 1134 (2003) (California law) (citation modified); *see also Asheim v. Pigeon Hole Parking, Inc.*, 175 F. Supp. 320, 330 (E.D. Wash. 1959) ("It has been repeatedly held in Washington that, to prove an implied contract the party claiming the benefit of such a contract must establish that there was a meeting of the minds of the parties on the terms of the implied contract."), *aff'd*, 283 F.2d 288 (9th Cir. 1960); *Soley v. Wasserman*, 823 F. Supp. 2d 221, 230 (S.D.N.Y. 2011) (New York law).

The fundamental elements of an express contract and an implied contract are the same; there must be "mutual assent (usually accomplished through the medium of an offer and acceptance) and consideration." *Pac. Bay Recovery, Inc. v. Cal. Physicians' Servs., Inc.*, 12 Cal. App. 5th 200, 215 (2017). Both types of contract "require a meeting of minds or an agreement." *Id.* To state an implied contract claim sufficiently, a plaintiff "must allege facts about the specific terms of its agreement or agreements with a defendant." *ABC Servs. Grp., Inc. v. United HealthCare Servs., Inc.*, No. 19-CV-0531, 2019 WL 4137624, at *6 (C.D. Cal. June 14, 2019), *aff'd in relevant part and reversed and remanded on other grounds sub nom.*, *ABC Servs. Grp., Inc. v. Aetna Health & Life Ins. Co.*, No. 20-CV-55821, 2022 WL 187849, at *1 (9th Cir. Jan. 20, 2022). The same standards apply to implied contracts formed under the laws of Washington and New York. *See Prestige Brands Inc. v. Guardian Drug Co.*, 951 F. Supp. 2d 441, 446 (S.D.N.Y. 2013) (elements of breach of contract are the same under New York and California law); *Corner Computing Sols. v. Google LLC*, 750 F. Supp. 3d 1208, 1214 (W.D. Wash. 2024) (same for Washington and California law).

Other than the conclusory allegation that Defendant, in some unspecified communication to Plaintiffs, promised that it would "safeguard and not disclose" their information, Plaintiffs fail to allege the circumstances under which Defendant made such promises, and the terms of those promises. Dkt. 25 ¶ 132.[14] Overly broad allegations of a contract's essential terms are insufficient to overcome a motion

[14] Defendant also argues that Plaintiffs' breach of implied contract claim fails because Plaintiffs have not alleged that they provided any consideration to Defendant. Dkt. 30-1 at 30. This argument is unpersuasive. The FAC alleges that Defendant received "substantial, quantifiable value from its use" of Plaintiffs' data, which is sufficient to satisfy the consideration requirement at the pleading stage. Dkt. 25 ¶¶ 78, 177. Defendant's argument that it

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-05099-JAK (MARx) | Date | July 14, 2026 |
| Title | D.B., et al. v. Bellesa Enterprises US, Inc. | | |

to dismiss. *See Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 450 (E.D.N.Y. 2013) ("A breach of contract claim will withstand a motion to dismiss only if plaintiff alleges the essential terms of the parties' purported contract in nonconclusory language, including the specific provisions of the contract upon which liability is predicated."); *Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 944 (S.D. Cal. 2021) ("[T]he allegations in the Complaint fail to plausibly set forth allegations to state a claim for breach of contract because they inadequately plead the terms of the alleged agreement."). Plaintiffs' appeal to *Gerber v. Twitter, Inc.*, No. 23-CV-00186, 2024 WL 5173313, at *9–10 (N.D. Cal. Dec. 18, 2024), is unavailing because there, unlike here, the complaint advanced affirmative allegations that the defendant had promised to safeguard user data in various documents, statements, and website representations.

At the hearing, Plaintiffs argued that the basis for their implied contract claim is Defendant's breach of their promise to safeguard user privacy made in the Privacy Policy. Although the Privacy Policy could support a claim for breach of implied contract in principle, the FAC does not make such allegations. *See* Dkt. 25 ¶ 131–138. And, as noted, allegations not properly made in a pleading are not a sufficient basis to respond to a motion to dismiss. *See, e.g.*, *Gerritsen*, 116 F. Supp. 3d at 1126.

For those reasons, the Motion is **GRANTED WITHOUT PREJUDICE**, *i.e.*, with leave to amend, as to Count III.

d) Common Law Unjust Enrichment (Count IV)

Defendant argues that Plaintiffs' unjust enrichment claim is precluded by their consent to disclosure of their information. As noted previously, the consent argument presently lacks merit. Dkt. 30-1 at 30–31. Defendant also argues that an unjust enrichment claim does not arise where a plaintiff has an adequate remedy at law. *Id.* at 31; *see also* Dkt. 39 at 14 (arguing that this count should be dismissed as duplicative of Plaintiffs' other claims). Plaintiffs respond that courts allow "unjust enrichment claims to proceed in pixel and data misuse cases like this one." Dkt. 35 at 28.

Although "[e]quitable relief is not appropriate where an adequate remedy exists at law," *Schroeder v. United States*, 569 F.3d 956, 963 (9th Cir. 2009), Plaintiffs are permitted to plead equitable relief in the alternative under Fed. R. Civ. P. 8(a)(3) and 8(d)(3). Rule 8(d)(3) allows the pleading of claims "regardless of consistency." Plaintiffs have done so adequately in the FAC. Dkt. 25 ¶ 147 ("Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damage."). That Plaintiffs have also advanced claims for which legal remedies may be available does not bar their unjust enrichment cause of action at the pleading stage. *See Larson v. Am. Honda Motor Co., Inc.*, No. 23-CV-01238, 2024 WL 3293875, at *10 (S.D. Cal. Apr. 2, 2024) ("Plaintiffs may plead their duplicative New York state law claims under Fed. R. Civ. P. 8(a)(3) regardless of if it would not be allowable under state law procedure."); *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762–63 (9th Cir. 2015) (California law); *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1234 (C.D. Cal. 2017) (Washington law).

never agreed to safeguard Plaintiffs' data fails for the same reasons previously discussed as to whether Plaintiffs consented to the sharing of their data. Dkt. 30-1 at 30.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-05099-JAK (MARx) | Date | July 14, 2026 |
| Title | D.B., et al. v. Bellesa Enterprises US, Inc. | | |

Defendant's contention that California law does not recognize unjust enrichment does not warrant dismissal of Count IV. Dkt. 39 at 14. "California courts 'appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy.'" *Glob. Med. Sols., Ltd. v. Simon*, No. 12-CV-4686, 2013 WL 12065418, at *38 (C.D. Cal. Sep. 24, 2013) (quoting *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007)). The Ninth Circuit has determined that "in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'" *Astiana*, 783 F.3d at 762. Nevertheless, Plaintiffs' claim for unjust enrichment is sufficiently alleged because the Ninth Circuit has held that courts "may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Id.* (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014)); *accord Produce Int'l v. Fresh Is Best, Inc.*, No. 19-CV-5935, 2023 WL 3311113, at *6 (C.D. Cal. Apr. 19, 2023). Therefore, at the pleading stage, this claim is sufficiently alleged. This does not constitute a final determination as to the viability of this claim as this action proceeds.

For those reasons, the Motion is **DENIED** as to Count IV.

## V. Conclusion

For the reasons stated in this Order, the Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**. A summary of the disposition of the Motion as to each of Plaintiffs' claims against Defendant is as follows:

| Cause of Action | Disposition |
|---|---|
| 1. Common Law Invasion of Privacy | **GRANTED WITH PREJUDICE** to the extent that claim arises under New York law; **DENIED** to the extent that claim arises under California or Washington law. |
| 2. Negligence | **DENIED** |
| 3. Breach of Implied Contract | **GRANTED WITHOUT PREJUDICE** |
| 4. Unjust Enrichment | **DENIED** |
| 5. VPPA | **GRANTED WITH PREJUDICE** |
| 6. ECPA | **DENIED** |
| 7. GBL § 349 | **DENIED** |
| 8. CIPA | **GRANTED WITH PREJUDICE** as to the current Plaintiffs; provided, however, that the claim may be advanced by a new named plaintiff with a sufficient nexus to California. |
| 9. UCL | **GRANTED WITH PREJUDICE** as to the current Plaintiffs; provided, however, that the claim may be advanced by a new named plaintiff with a sufficient nexus to California. |

/ / /

/ / /

/ / /

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-05099-JAK (MARx) | Date | July 14, 2026 |
| Title | D.B., et al. v. Bellesa Enterprises US, Inc. | | |

The SAC shall be filed within 14 days of the issuance of this Order and shall adhere to the terms and limitations as stated in this Order.[15]

**IT IS SO ORDERED.**

__________ : __________

Initials of Preparer LC3

[15] Plaintiffs are granted leave to amend the FAC only in the specific respects identified in this Order. No other amendments are permitted without further leave to do so.